# EXHIBIT 1



## ≡≡ TAPCO ≡≡
### UNDERWRITERS INC.

| Commercial Division<br>1-800-334-5579 | 3060 South Church Street • P.O. Box 286<br>Burlington, North Carolina 27216<br>(Local) 336-584-8892<br>(Fax) 336 584 8880<br>(Claims Fax) 336-538-0094 | Personal Lines Division<br>1-800-548-1489 |

### Certification

The undersigned hereby certifies that the attached is a true and complete copy of policy number ALTE 003493 issued to Tim & Flo Realty/ Construction Firm for Commercial General Liability coverage; by Tapco Underwriters, Inc., a managing general agent for Alea London Limited.

Tapco Underwriters, Inc.

By _Danielle J Kernodle_

Danielle J Kernodle
Claims Department





| Burlington, North Carolina | Charleston, South Carolina | Clearwater, Florida | Manassas, Virginia |

| DATE ISSUED | CONTRACT NO. | | PREVIOUS NO. |
|---|---|---|---|
| September 3, 2004 | 330.320.04 | | NEW |

THIS DECLARATION PAGE IS ATTACHED TO AND FORMS PART OF CERTIFICATE/COVER NOTE PROVISIONS

ITEM   CERTIFICATE / POLICY NUMBER:   **ALTE003493**

**1**

**Name of Assured**
TIM & FLO REALTY/CONSTRUCTION FIRM

5614 5TH STREET, NE
WASHINGTON, DC 20011

EQUITABLE INSURANCE AGENCY INC
4710 AUTH PLACE, STE. 685

CAMP SPRINGS, MD 20746

THIS POLICY IS ISSUED BY AN INSURANCE COMPANY WHICH IS NOT LICENCED IN THE DISTRICT OF COLUMBIA. IN CASE OF INSOLVENCY OF THIS COMPANY, CLAIMS WILL NOT BE COVERED UNDER THE DISTRICT OF COLUMBIA INSURANCE GUARANTY ASSOCIATION ACT.

**2** Effective From 12:01am Both Days at Standard Time :   August 23, 2004   TO   August 23, 2005

**3** Acting upon your instruction, we have effected the insurance with:

| NAME OF INSURERS | AMOUNT OR PERCENT |
|---|---|
| **ALEA LONDON LIMITED** | **100%** |

APRBU

**4**

| LIMIT | COVERAGE | RATE | PREMIUM |
|---|---|---|---|
| $1,000,000 | COMMERCIAL GENERAL LIABILITY | SEE CL150 | $750.00 |

TOTAL BASE   $750.00

**5** SPECIAL CONDITIONS
IL0017 (11-85), IL0021(11-85), TAPCO1998, MOLD EXCL (10-01), CL150

| TERRORISM PREMIUM | |
|---|---|
| POLICY FEE | $100.00 |
| INSPECTION | |
| TAX | $15.00 |
| TOTAL | $865.00 |

**6**

In witness whereof this covernote has been signed at BURLINGTON, NC this 3   day of   September · 2004

TAMMYT      DC

TAPCO UNDERWRITERS, INC

by _____

GU 267
(11-85)

IL 00 17 11 85

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

## E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

GU 267 (11-85)
IL 00 17 11 85

Copyright, Insurance Services Office, Inc., 1982, 1983

GU 276a
(11-85)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IL 00 21 11 85

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY

COMMERCIAL AUTO COVERAGE PART

COMMERCIAL GENERAL LIABILITY COVERAGE PART

FARM COVERAGE PART

PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

LIQUOR LIABILITY COVERAGE PART

POLLUTION LIABILITY COVERAGE PART

OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART

RAILROAD PROTECTIVE LIABILITY COVERAGE PART

SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY
NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

      (1) The "nuclear material" (a) is at any "nuclear

facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" include radioactive, toxic or explosive properties;

   "Nuclear material" means "source material," "Special nuclear material" or "by-product material";

   "Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

   "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes

Copyright, Insurance Services Office, Inc., 1983, 1984

produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel" or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

Copyright, Insurance Services Office, Inc., 1983, 1984

GU 278a (11 85)
IL 00 21 11 85

## SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon

LeBoeuf, Lamb, Green & MacRae 125 West 55th St. New York, NY 10019-4513

and that in any suit instituted against any one of them upon this contract. Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

TAPCO 1009

THIS ENDORSEMENT CHANGES THE POLICY - PLEASE READ CAREFULLY

The following provision changes coverage afforded by the Policy:

## TOTAL "MOLD" EXCLUSION

Notwithstanding anything to the contrary contained in the Policy,:

This insurance does not apply to "bodily injury", "property damage", "personal injury", "advertising injury", "medical payments" arising out of, resulting from, caused by, contributed to, or in any way related to any "mold".

This exclusion applies to all "bodily injury", "property damage", and "medical payments" included in the "products-completed operations hazard". This exclusion also applies to all "bodily injury", "property damage" and "medical payments" which is not included in the "products-completed operations hazard".

This exclusion also applies to any loss, cost or expense arising out of or associated, in any way, with any:

1) request, demand, or order that any insured or others abate, mitigate, test for, monitor, remediate, clean up, remove, contain, treat, detoxify, kill, destroy, dispose of, investigate or neutralize, or in any way respond to or assess the presence or effects of "mold"; or

2) claim or suit on behalf of any person, entity, or organization, including any governmental authority, for damages because of abating, mitigating, testing for, monitoring, remediating, clean up, removing, containing, treating, detoxifying, killing, destroying, disposing of, investigating, or neutralizing, or in any way responding to, or assessing, the effects of "mold"; or

3) any obligation to share with, repay, or indemnify any person, organization or entity, related in any way to items 1) and 2) above.

We will not defend any claim or suit, or pay any damages, loss, expense, cost, or obligation caused directly or indirectly by, arising out of, resulting from, contributed to by, or related in an way to "mold".

The following definition is added to the Policy:

"Mold" means any species of fungi, including, but not limited to, mold, yeast, mildew, spores, mold toxins, mycotoxins, mold metabolites, mold antigens, mold allergens, mold-produced antibiotics, or dust or fumes containing any of the foregoing, individually, or in any combination therewith or with another substance.

Commercial General Liability Total Mold Exclusion
MOLD EXCL (10-01)

## THIS ENDORSEMENT CHANGES THE POLICY - PLEASE READ CAREFULLY

The following provision changes coverage afforded by the Policy:

### TOTAL "MOLD" EXCLUSION

Notwithstanding anything to the contrary contained in the Policy,:

We will not pay for loss, damage, cost, or expense caused directly or indirectly by , arising out of, resulting from, contributed to by, or related in any way to "mold". Loss, damage, cost, or expense caused directly or indirectly by, arising out of, resulting from, contributed to by, or related in any way to "mold" is excluded regardless of any other cause or event that contributes concurrently, or in any sequence with, the loss, damage, cost or expense.

The following definition is added to the Policy;

"Mold" means any species of fungi, including, but not limited to, mold, yeast, mildew, spores, mold toxins, mycotoxins, mold metabolites, mold antigens, mold allergens, mold-produced antibiotics, or dust or fumes containing any of the foregoing individually, or in any combination therewith or another substance.

Commercial Property Total Mold Exclusion
MOLD EXCL (10-01)

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## SUPPLEMENTAL DECLARATIONS

| | | |
|---|---|---|
| Policy No. ALTE003493 | Effective Date | August 23, 2004 |
| | | 12:01 A.M., Standard Time |

Named Insured  TIM & FLO REALTY/CONSTRUCTION FIRM    Agent No.  4500285

**Item 1. Limits of Insurance**

| Coverage | Limit of Liability | |
|---|---|---|
| Aggregate Limits of Liability | $  $2,000,000 | General Aggregate (other than Products/Completed Operations) |
| | $  1,000,000 | Products/Completed Operations Aggregate |
| Coverage B - Personal and Advertising Injury Limit | $  1,000,000 | Personal and Advertising Injury Limit |
| Coverage A - Bodily Injury and Property Damage Liability | $  1,000,000 | Each Occurrence Limit |
| Damage to Premises Rented to You Limit | $  50,000 | Fire Damage Limit |
| Coverage C - Medical Payments | $  5,000 | Medical Expense Limit |

**Item 2. Description of Business**

Form of Business:

☒  Individual      ☐  Partnership      ☐  Joint Venture      ☐  Trust      ☐  Limited Liability Company

☐  Organization Including a corporation (other than Partnership, Joint Venture or Limited Liability Company)

Location of All Premises You Own, Rent or Occupy:
5614 5TH STREET, NW, WASHINGTON, DC 20011

Description of Business:
CARPENTRY CONSTRUCTION OF RESIDENTIAL PROPERTY NOT EXCEEDING THREE STORIES IN HEIGHT

**Item 3. Forms and Endorsements**

Form(s) and Endorsement(s) made a part of this policy at time of issue:
CL150 - EX, ALEA-GL-01 (01/04), EZ-EXCL-01 (06/03), CG0001 (1-96), CG2136 (11/85), CG2139 (10-93), CG 2160 (4-98), CG2175 (12-02), UTS-128g(10-94), x

**Item 4. Premiums**

| | | |
|---|---|---|
| Coverage Part Premium: | $ | $750.00 |
| Other Premium: | $ | |
| Total Premium: | $ | $750.00 |

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

CL150

# COMMERCIAL GENERAL LIABILITY COVERAGE PART
## EXTENSION OF SUPPLEMENTAL DECLARATIONS

Policy No. ___ALTE003493___

Effective Date: ___August 23, 2004___
12:01 A.M., Standard Time

Named Insured ___TIM & FLO REALTY/CONSTRUCTION FIRM___

Agent No. ___4500285___

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| 01 | 01 | 91340 | 16,000 | PAYROLL - per $1000 of Payroll | |
| **Class Description:** CARPENTRY- CONSTRUCTION OF RESIDENTIAL PROPERTY NOT EXCEEDING THREE STORIES IN HEIGHT | | | | **Premises/Operations** | |
| | | | | Rate | Premium |
| | | | | 10.16 | $563 MP |
| | | | | **Products/Comp Operations** | |
| | | | | Rate | Premium |
| | | | | 3.38 | $187 MP |

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| | | | | | |
| **Class Description:** | | | | **Premises/Operations** | |
| | | | | Rate | Premium |
| | | | | | |
| | | | | **Products/Comp Operations** | |
| | | | | Rate | Premium |
| | | | | | |

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| | | | | | |
| **Class Description:** | | | | **Premises/Operations** | |
| | | | | Rate | Premium |
| | | | | | |
| | | | | **Products/Comp Operations** | |
| | | | | Rate | Premium |
| | | | | | |

| Prem. No. | Bldg. No. | Class Code | Exposure | Basis | |
|---|---|---|---|---|---|
| | | | | | |
| **Class Description:** | | | | **Premises/Operations** | |
| | | | | Rate | Premium |
| | | | | | |
| | | | | **Products/Comp Operations** | |
| | | | | Rate | Premium |
| | | | | | |

CL150 - EX

| ALEA-GL-01 | | | |
|---|---|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE | | INSURED |
|---|---|---|---|
| | MONTH    DAY    YEAR | | |
| ALTE003493 | August 23, 2004 | | TIM & FLO REALTY/CONSTRUCTION FIRM |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
**ALL SECTIONS OF THIS SEVEN (7) PAGE ALEA-GL-01 APPLY TO, AND MODIFY, YOUR POLICY.**

## ADDITIONAL EXCLUSIONS

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

---

### EXCLUSION - TOTAL POLLUTION

Exclusion f. under COVERAGE A (Section I) is replaced by the following:

f.   (1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

(2) Any loss, cost or expense arising out of any:

(a)  Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralise, or in any way respond to, or assess the effects of pollutants; or

(b)  Claim or suit by or on behalf of a government authority for damages because of testing for, monitoring, clearing up, removing, containing, treating, detoxifying or neutralising, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapour, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

CG 21 49 11 88

---

### EXCLUSION - ASBESTOS, SILICA DUST, TOXIC SUBSTANCES

The following exclusion is added to COVERAGES A, B, and C (Section I)

This insurance does not apply to:

(1)  "Bodily injury," "personal injury" or medical payments caused by asbestosis, silicosis, mesothelioma, emphysema, pneumoconiosis, pulmonary fibrosis, pleuritis, endothelium or any lung disease or any ailment caused by, or aggravated by exposure, inhalation, consumption or absorption of asbestos fibres or dust or silica dust;

(2)  Any "property damage" due to or arising out of the actual or alleged presence of asbestos or silica dust in any form, including the costs of remedial investigations or feasibility studies, or to the costs of testing, monitoring, cleaning or removal of any property or substance; or

(3)  "Bodily injury," "property damage," "advertising injury," "personal injury" or medical payments or any other action based upon the Insured(s) supervision, removal; instructions, recommendations, warranties (expressed or implied), warnings or advice given, or withheld regarding asbestos fibres or dust or silica dust.

(4)  The installation, manufacture, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by the policy does not apply to payment for the investigation or defense of any claim or any cost, fine or penalty or for any expense or claim or suit related to any of the above.

---

ALEA-GL-01

**EXCLUSION - LEAD CONTAMINATION**

The following exclusion is added to COVERAGES A, B, AND C (Section I):

This insurance does not apply to:

    (1) "Bodily injury," "property damage," "advertising injury," "personal injury" or medical payments arising out of the ingestion, inhalation or absorption of lead in any form;

    (2) Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralise, or in any way respond to, or assess the effects of lead; or

    (3) Any loss, cost or expense arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralising, or in any way responding to, or assessing the effects of lead.

**EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGE**

The following exclusion is added to COVERAGES A, B, and C (Section I):

This insurance does not apply to a claim of or indemnification for punitive or exemplary damages. If a suit shall have been brought against you for a claim within the coverage provided under the policy, seeking both compensatory and punitive or exemplary damages, then we will afford a defense for such action. We shall not have an obligation to pay for any costs, interest, or damages attributable to punitive or exemplary damages.

**EXCLUSION - VOLUNTARY LABOR**

The following exclusion is added to COVERAGE A, B and C (Section I):

This insurance does not apply to "bodily injury", "personal injury" or medical payments to any member, associate, affiliated member, or to any person or persons loaned to or volunteering services to you, whether or not paid by you, arising out of or in the course of work performed for you or on your behalf.

**EXCLUSION - EMPLOYMENT RELATED PRACTICES**

The following is added to COVERAGE A and B (Section I):

This insurance does not apply to "bodily injury" or "personal injury" arising out of any:

    (1) Refusal to employ;
    (2) Termination of employment;
    (3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or
    (4) Consequential "bodily injury" or "personal injury" as a result of (1) through (3) above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

ALEA-GL-01 (01/04)
Page 2 of 7

ALEA-GL-01

### EXCLUSION - ASSAULT AND BATTERY

This insurance does not apply to any claim arising out of an assault and/or battery or out of any act or failure to act to prevent or suppress an assault and/or battery whether caused by the insured, an employee, a patron or any other person.

This exclusion applies to all causes of action arising out of an assault and/or battery including, but not limited to, allegations of negligent hiring, placement, training, or supervision, or to any act, error or omission relating to an assault and/or battery.

### EXCLUSION - ABUSE OR MOLESTATION

The following exclusion is added to COVERAGES A, B and C (Section I):

This insurance does not apply to "bodily injury," "personal injury" or medical payments arising out of:

(1) The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured; or

(2) The negligent:
    (a) employment;
    (b) investigation;
    (c) supervision;
    (d) reporting to the proper authorities, or failure to so report; or
    (e) retention;

    of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (1) above.

### EXCLUSION - COMMUNICABLE DISEASE

The following exclusion is added to COVERAGES A, B and C (Section I):

This insurance does not apply to "bodily injury," "personal injury" or medical payments arising out of claims, accusations or charges brought by or against any insured(s) for actual or alleged damages arising out of a communicable disease no matter how transmitted including, but not limited to, Acquired Immune Deficiency Syndrome (AIDS).

### EXCLUSION - PARTICIPANTS

The following exclusion is added to Paragraph 2., Exclusions of Coverage (Section I - Coverages):

This insurance does not apply to "bodily injury," "personal injury" or medical payments to "any person" while practicing for or participating in any circus, concert, demonstration, event, exhibition, race, rodeo, show, contest or any activity of an athletic or sports nature for the events shown in this Schedule.

The following exclusion is added to Paragraph 2., Exclusions of COVERAGE A. Bodily Injury and Property Damage Liability (Section I - Coverages):

This insurance does not apply to "property damage" to property of "any person" defined herein including but not limited to "autos", watercraft, aircraft, animals or any other property of the foregoing.

The following definition is added to DEFINITIONS. (Section V):

"Any person" shall include but is not limited to animal handlers, announcers, attendants, clowns, contestants, entertainers, mechanics, musicians, officials, participants, singers, speakers, stage crews, stock contractors, vendors or their employees, any person employed by or doing volunteer work for you or on your behalf, or any person involved in the promotion, sponsoring or production of the event designated in the Schedule.

PAR EXC 01 (01/04)

ALEA-GL-01 (01/04)
Page 3 of 7

ALEA-GL-01

### EXCLUSION - CLASSIFICATION LIMITATION

The following exclusion is added to COVERAGES A, B, and C (Section I):

This insurance does not apply to "bodily injury", "Property damage", "advertising injury", "personal injury" or medical payments for operations which are not classified or shown on the Commercial General Liability Coverage Declarations, its endorsements or supplements.

### ADDITIONAL CONDITIONS

### NOTICE TO ALL POLICY HOLDERS

This insurance does not provide coverage as required by Environmental Protection Agency (EPA) 40 CFR Parts 280 and 281 for underground storage tanks nor any coverage under CERCLA or similar State or Federal Environmental Act(s).

THIS POLICY EXCLUDES COVERAGE FOR POLLUTION AND / OR ACTUAL, ALLEGED OR THREATENED DISCHARGE, DISPERSAL, SEEPAGE, MIGRATION, RELEASE OR ESCAPE OF POLLUTANTS AT ANY TIME.

### LIMITATION - OTHER INSURANCE

Other Insurance, under COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV), item b(3) providing Excess Insurance if the loss arises out of the maintenance or use of aircraft, "autos" or watercraft is deleted.

### AMENDMENT OF LIQUOR LIABILITY EXCLUSION

This Endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion c. of Coverage A (Section I) is replaced by the following:

c.   "Bodily Injury" or "Property Damage" for which any insured may be held liable by reason of:

    (1)   Causing or contributing to the intoxication of any person;
    (2)   The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
    (3)   Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

    (1)   Manufacture, sell or distribute alcoholic beverages;
    (2)   Serve or furnish alcoholic beverages for a charge whether or not such activity:

        (a)   Requires a license
        (b)   Is for the purpose of financial gain or livelihood; or

    (3)   Serve or furnish alcoholic beverages without a charge, if a license is required for such activity.

CG 21 50 09 89

ALEA-GL-01

## EXCLUSION - ELECTROMAGNETIC FIELDS

The following exclusion is added to COVERAGES A, B, C (Section I):

This insurance does not apply to and no duty to defend is provided by us for any claim for "bodily injury", "property damage", "personal injury", "advertising injury" or medical payments which arise out of, or is contributed to either directly or indirectly, by exposure to magnetic fields, electric fields, electromagnetic fields, electronic fields or any other radiation, however caused or generated.

## EXCLUSION - INDEPENDENT CONTRACTORS EMPLOYEES OR LEASED WORKERS

This insurance does not apply to "Bodily Injury", "Personal Injury", "Advertising Injury" to:

1.  Any employee or leased worker of independent contractors arising out of operations performed for you by said independent contractors or your acts or omissions in connection with general supervision of such operations if you have rejected the obligations of any workers' compensation or similar law, or abrogated, waived or otherwise set aside common rights or defenses generally accorded any employer under any workers' compensation, disability benefits or unemployment compensation law or any similar law; or

2.  The spouse, child, parent, brother or sister of that employee or leased worker as a consequence of 1. above.

## MINIMUM EARNED PREMIUM ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that minimum earned premium of 25% (twenty-five per cent) applies to this policy.

## EXCLUSION - RADON GAS

The following exclusion is added to COVERAGES A, B, and C (Section I):

This insurance does not apply to and no duty to defend is provided by us for:

1.  "Bodily injury", "property damage", "personal injury", "advertising injury" or medical payments arising out of the presence of, exposure to, ingestion of, emission or release of radon gas.

2.  Any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to or assess the effects of radon gas; or

3.  Any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of radon gas.

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-subscribing insurer, who for any reason, does not satisfy all or part of its obligations.

LSW1001 (8/94)

ALEA-GL-01 (01/04)
Page 5 of 7

ALEA-GL-01

**EXCLUSION - INJURY TO LEASED WORKERS AND
PRACTICES RELATED TO LEASED WORKERS**

A. The following exclusions are added to paragraph 2., Exclusion, COVERAGE A (Section I):

This insurance does not apply to:

o. "Bodily injury" to:

   (1) Any "leased worker" arising out of and in the course of performing his or her duties related to the conduct of your business;

   (2) The spouse, child, parent, brother or sister of that "leased worker" as a consequence of (1) above.

This exclusion applies:

   (1) Whether the "insured" may be liable as an employer or in any other capacity; and

   (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

p. "Bodily injury" arising out of any:

   (1) Refusal to lease a worker

   (2) Recommendation to a labor contractor to terminate the duties performed by a "leased worker" which relate to the conduct of your business.

   (3) Coercion, defamation, harassment, humiliation, or discrimination, recommendation to a labor contractor for demotion, evaluation, reassignment, or discipline of a "leased worker" or other leasing-related practices, policies, acts or omission; or

   (4) Consequential "bodily injury" as a result of (1) through (3) above.

This exclusion applies:

   (1) Whether the "insured" may be held liable as the party responsible for directing the "leased worker" in the performance of his duties related to the conduct of your business or in any other capacity; and

   (2) To any obligation to share damages with or to repay someone else who must pay damages because of the injury.

B. The following exclusion is added to paragraph 2. Exclusions. COVERAGE B (Section I):

This insurance does not apply to:

c. "Personal injury" or "advertising injury" arising out of any:

   (1) Refusal to lease a worker

   (2) Recommendation to a labor contractor to terminate the duties performed by a "leased worker" which relate to the conduct of your business.

   (3) Coercion, defamation, harassment, humiliation, or discrimination; recommendation to a labor contractor for demotion, evaluation, reassignment, or discipline of a "leased worker" or other leasing-related practices, policies, acts or omission; or

   (4) Consequential "Personal injury" or "advertising injury" as a result of (1) through (3) above.

C. The DEFINITIONS Section is amended to include the following:

"Leased worker" means a person employed be a labor contractor and leased to you.

ALEA-GL-01 (01/04)
Page 6 of 7

ALEA-GL-01

## CANCELLATION CLAUSE

NOTWITHSTANDING anything contained in this Insurance to the contrary, this Insurance may be cancelled by the Insured at any time by written notice or by surrender of this contract of Insurance. This Insurance may also be cancelled by or on behalf of the Insurers by the delivery to the Insured or by mailing to the Insured, by registered, certified or other first class mail, at the Insured's address as shown in this Insurance written notice stating when, not less that ten (10) days thereafter, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice and this Insurance shall terminate at the date and hour specified in such notice.

If this Insurance shall be cancelled by the Insured, the Insurers shall retain customary short rate proportion of the premium hereon, except that if this Insurance is on an adjustable basis, the Insurers shall receive the earned premium hereon or the pro rata proportion of any minimum premium stipulated herein, whichever is the greater.

Payment or tender of any unearned premium by the Insurers shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended as to be equal to the minimum period of limitation permitted by such law.

LONDON FORM 1331

## RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE -
### PHYSICAL DAMAGE DIRECT

This policy does not cover any loss or damage arising directly or indirectly from nuclear reaction, nuclear radiation or radioactive contamination, however such nuclear reaction, nuclear radiation or radioactive contamination may have been caused: *NEVERTHELESS if Fire is an insured peril and a Fire arises directly or indirectly from nuclear reaction, nuclear radiation or radioactive contamination, any loss or damage arising directly from the Fire shall (subject to the provisions of this policy) be covered EXCLUDING however all loss or damage caused by nuclear reaction, nuclear radiation or radioactive contamination arising directly or indirectly from that Fire.

*Note - If Fire is not an insured peril under this policy the words "NEVERTHELESS" to the end of the clause do not apply and should be disregarded.

LONDON FORM 1191

## SERVICE OF SUIT CLAUSE

It is agreed that in the event of failure of the Underwriters to pay any amount claimed to be due hereunder, the Underwriters, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of the Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon LeBoeuf, Lamb, Greene and MacRae 125 West 55th St. New York, NY 10019-4513 and that any suit instituted against any one of them upon this contract. Underwriters will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Insurers' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this Contract of Insurance (or Reinsurance), and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

LONDON FORM 1998

## WAR AND CIVIL WAR EXCLUSION CLAUSE

Notwithstanding anything to the contrary contained herein, this Policy does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

LONDON FORM 464

ALEA-GL-01 (01/04)
Page 7 of 7

EZ-EXCL-01

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE MONTH / DAY / YEAR | INSURED |
|---|---|---|
| ALTE003493 | August 23, 2004 | TIM & FLO REALTY/CONSTRUCTION FIRM |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.
ALL SECTIONS OF THIS FOUR (4) PAGE EZ-EXCL-01 APPLY TO, AND MODIFY, YOUR POLICY.

## ADDITIONAL EXCLUSIONS

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### EXCLUSION - Earth Movement

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" nor do we have any duty to defend any claim, suit, action, demand, arbitration or alternative dispute resolution arising from, attributable or contributed to or aggravated by the movement of land whether caused by or resulting from natural forces or contributed to, in any way, by any work or operations performed by you or any contractor or subcontractor.

"Movement of land" includes but is not limited to any movement of earth or land, whether at the surface or below the surface and includes any movement of earth to a higher or lower level, landslide, mud flow, mud slide, shearing, rising, settling, shifting or shrinking.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

Alea.36 01/02

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### EXCLUSION - Losses, Claims and Litigation
### Preceding Inception of Policy

This insurance does not apply to any "bodily injury", "property damage", "personal injury" or "advertising injury" nor do we have any duty to defend

1.   Any damage, loss, cost or expense which began to occur, in whole or part, before the inception date of this policy and which continues into the policy period regardless of whether any person (including the insured) knew or had reason to know of any damage, loss, cost or expense;

2.   Any claim, suit, action, demand, arbitration, alternative dispute resolution which arose before the inception date of this policy
(a)  regardless of whether the insured knew of any such claim, suit, action, demand, arbitration or alternative dispute resolution and
(b)  irrespective of whether ultimate liability or the final amount of damages, loss, cost or expense has or has not been established.

This policy applies only to damage, loss, cost or expense, which first occurs in the policy period

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

Alea.37 01/02

EZ-EXCL-01

## ORAL CONTRACTS EXCLUSION

The Definition of "insured contract" is amended solely to apply to such contracts or agreements which existed in writing prior to an occurrence; in no event will this insurance apply to any allegation of liability assumed by the insured under an oral contract.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

TPCONT.08

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## DESIGNATED WORK EXCLUSION - EXTERIOR INSULATION AND FINISH SYSTEMS

This insurance modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

PRODUCT/COMPLETED OPERATIONS LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of "your work" described as:

1. The design, manufacture, construction, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service, correction, or replacement, of an "exterior insulation and finish system" (commonly referred to as synthetic stucco) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulkings or sealants in connection with such a system.

2. Any work or operation with respect to any exterior component, fixture or feature of any structure if any "exterior insulation and finish system" is used on any part of that structure.

For the purposes of this endorsement, an "exterior insulation and finish system" means an exterior cladding or finish system used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene or other materials; and

2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate; and

3. A reinforced base coat; and

4. A finish coat providing surface texture and color.

GLS-170s (10-97)

---

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CONTRACTORS SPECIAL CONDITIONS

The following has been added to the policy:

CONTRACTORS SPECIAL CONDITIONS

You will obtain certificates of insurance from all independent contractors providing evidence of:

1. limits of liability equal to or greater than the limits provided by this policy; and

2. coverage equal to or greater than the coverages provided by this policy.

Failure to comply with this condition does not alter the coverage provided by this policy. However, should you fail to comply, independent contractors will be considered to be your employees and a premium charge will be made accordingly. The "total cost" of all work sublet will be used as payroll for the work performed.

"Total cost" means the cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work for all fees, bonuses or commissions paid.

UTS-246s (8/96)

---

EZ-EXCL-01 (06/03)
Page 2 of 4

EZ-EXCL-01

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## AMENDMENT OF INSURING AGREEMENT-
## KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART (OCCURRENCE VERSION)

Paragraph 1. Insuring Agreement of Section I - Coverage A - Bodily Injury And Property Damage Liability is replaced by the following:

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by an insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

CG 00 57 09 99

EZ-EXCL-01 (06/03)
Page 3 of 4

EZ-EXCL-01

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## SPECIFIED OPERATIONS EXCLUSION - ROOFING

It is agreed no coverage is afforded for any liability or claim that arises out of, is related to, or connected with the following:

Roofing Construction, Repair, or Maintenance

Alea Roof 001 (12/02)

---

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to paragraph 2., Exclusions of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages) and paragraph 2., Exclusions of COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY (Section I - Coverages):

1.  This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
    a.  Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
    b.  Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.
2.  Subject to paragraph 3. below, professional services include:
    a.  The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
    b.  Supervisory or inspection activities performed as part of any related architectural or engineering activities.
3.  Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

CG2279 (01/96)

---

EZ-EXCL-01 (06/03)
Page 4 of 4

CG 00 01 01 96

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we," "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Other words and phrases that appear in quotation marks have special meaning. Refer to DEFINITIONS (SECTION V).

## SECTION I - COVERAGES

### COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement.**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period.

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

2. **Exclusions.**

   This insurance does not apply to:

   a. **Expected or Intended Injury**

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. **Contractual Liability**

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract," reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage," provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

         (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

   c. **Liquor Liability**

      "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

      (1) Causing or contributing to the intoxication of any person;

      (2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      (3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

      This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

CG 00 01 01 96

Copyright, Insurance Services Office, Inc., 1994

Page 1 of 11

d. Workers' Compensation and Similar Laws
Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. Employer's Liability
"Bodily injury" to:
(1) An "employee" of the insured arising out of and in the course of:
    (a) Employment by the insured; or
    (b) Performing duties related to the conduct of the insured's business; or
(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of paragraph (1) above.
This exclusion applies:
(1) Whether the insured may be liable as an employer or in any other capacity; and
(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.
This exclusion does not apply to liability assumed by the insured under an "insured contract."

f. Pollution
(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
    (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured;
    (b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
    (c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or
    (d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:
        (i) If the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor; or
        (ii) If the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the

effects of pollutants.
Subparagraph (d)(i) does not apply to "bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids are intentionally discharged, dispersed or released, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent to be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.

(2) Any loss, cost or expense arising out of any:
    (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
    (b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

g. Aircraft, Auto or Watercraft
"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."
This exclusion does not apply to:
(1) A watercraft while ashore on premises you own or rent;
(2) A watercraft you do not own that is:
    (a) Less than 26 feet long; and

Copyright, Insurance Services Office, Inc., 1994

      (b) Not being used to carry persons or property for a charge;

    (3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

    (4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

    (5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in paragraph f.(2) or f.(3) of the definition of "mobile equipment."

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

    (1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

    (2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage to Property**

"Property damage" to:

    (1) Property you own, rent or occupy;

    (2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

    (3) Property loaned to you;

    (4) Personal property in the care, custody or control of the insured;

    (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

    (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

    (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

    (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    (1) "Your product";

    (2) "Your work"; or

    (3) "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in LIMITS OF INSURANCE (Section III).

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal injury" or

"advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in LIMITS OF INSURANCE (SECTION III); and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A AND B.

b. This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services;

but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions.**

This insurance does not apply to:

a. "Personal injury" or "advertising injury":

(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

(4) For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement; or

(5) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.

b. "Advertising injury" arising out of:

(1) Breach of contract, other than misappropriation of advertising ideas under an implied contract;

(2) The failure of goods, products or services to conform with advertised quality or performance;

(3) The wrong description of the price of goods, products or services; or

(4) An offense committed by an insured whose

business is advertising, broadcasting, publishing or telecasting.

c. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**COVERAGE C. MEDICAL PAYMENTS**

1. **Insuring Agreement.**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions.**

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a simi-

Copyright, Insurance Services Office, Inc., 1994

lar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard."

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.

2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit," including actual loss of earnings up to $250 a day because of time off from work.

5. All costs taxed against the insured in the "suit."

6. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit," we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against

such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit."

So long as the above conditions are met, attorneys fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by the indemnitee and necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of paragraph 2.b.(2) of COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I - Coverages), such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in paragraph f. above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties

as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

a. Your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:

(1) "Bodily injury" or "personal injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees," any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property, and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law,

any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal injury" or "advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits."

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard."

    Copyright, Insurance Services Office, Inc., 1994    CG 00 01 01 96

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal injury" and all "advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:
   a. Damages under Coverage A; and
   b. Medical expenses under Coverage C
   because of all "bodily injury" and "property damage" arising out of any one "occurrence."

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of "property damage" to premises, while rented to you or temporarily occupied by you with permission of the owner, arising out of any one fire.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy.**
   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit.**
   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:
      (1) How, when and where the "occurrence" or offense took place;
      (2) The names and addresses of any injured persons and witnesses; and
      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.
   b. If a claim is made or "suit" is brought against any insured, you must:
      (1) Immediately record the specifics of the claim or "suit" and the date received; and
      (2) Notify us as soon as practicable.
      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
   c. You and any other involved insured must:

   (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
   (2) Authorize us to obtain records and other information;
   (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and
   (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.
   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us.**
   No person or organization has a right under this Coverage Part:
   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or
   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.
   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance.**
   If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
   a. **Primary Insurance**
      This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
   b. **Excess Insurance**
      This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis:
      (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
      (2) That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner; or
      (3) If the loss arises out of the maintenance or

  Copyright, Insurance Services Office, Inc. 1994

use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit." If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amount until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. Premium Audit.

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. Representations.

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. Separation Of Insureds.

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. Transfer Of Rights Of Recovery Against Others To Us.

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. When We Do Not Renew.

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

SECTION V - DEFINITIONS

1. "Advertising injury" means injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment."

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

Copyright, Insurance Services Office, Inc., 1994

CG 00 01 01 96

(a) Goods or products made or sold by you in the territory described in a. above; or

(b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

8. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

9. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

10. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto."

11. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above

Copyright, Insurance Services Office, Inc., 1994

that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   (1) Equipment designed primarily for:
     (a) Snow removal;
     (b) Road maintenance, but not construction or resurfacing; or
     (c) Street cleaning;

   (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

13. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

e. Oral or written publication of material that violates a person's right of privacy.

14. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

     (a) When all of the work called for in your contract has been completed.

     (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

     (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

   (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

15. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

16. "Suit" means a civil proceeding in which damages because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

17. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

18. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or dis-

 Copyright, Insurance Services Office, Inc., 1994 CG 00 01 01 96

posed of by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

19. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions.

Copyright, Insurance Services Office, Inc., 1994

CL 273
(11-85)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

CG 21 36 11 85

# EXCLUSION—NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Part **4.** of WHO IS AN INSURED (Section II) does not apply.

CL 699
(10-93)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

CG 21 39 10 93

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINITIONS Section is replaced by the following:

"Insured contract" means:

a.  A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b.  A sidetrack agreement;

c.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e.  An elevator maintenance agreement.

COMMERCIAL GENERAL LIABILITY
CG 21 60 04 98

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

2. Exclusions

This insurance does not apply to "bodily injury" or "property damage", "personal injury" or "advertising injury" arising directly or indirectly out of:

a. Any actual or alleged failure, malfunction or inadequacy of:

   (1) Any of the following, whether belonging to any insured or to others:

      (a) Computer hardware, including microprocessors;

      (b) Computer application software;

      (c) Computer operating system and related software;

      (d) Computer networks;

      (e) Microprocessors (computer chips) not part of any computer system; or

      (f) Any other computerized or electronic equipment or components; or

   (2) Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph 2.a.(1) of this endorsement

   due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

b. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph 2.a. of this endorsement.

CG 21 60 04 98                Copyright, Insurance Services Office, Inc., 1997                Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 75 12 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART
    UNDERGROUND STORAGE TANK POLICY

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

Any injury or damage arising, directly or indirectly, out of a "certified act of terrorism" or an "other act of terrorism". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs 1. and 2. describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

B. The following definitions are added:

1. For the purposes of this endorsement, any injury or damage means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to bodily injury, property damage, personal and advertising injury, injury or environmental damage as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

   a. The act resulted in aggregate losses in excess of $5 million; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002. Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

   Copyrigyt, ISO Properties, Inc., 2002

# ENDORSEMENT
## NO. _____

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | (STANDARD TIME) | | | | INSURED | AGENCY AND CODE |
|---|---|---|---|---|---|---|
| | MO. | DAY | YR. | 12:01 NOON | | |
| | | | | A.M. X | | |
| ALTE003493 | August 23, 2004 | | | | TIM & FLO REALTY/CONSTRUCTION FIRM | EQUITABLE INSURANCE AGENCY INC 4500285 |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### OPTIONAL PROVISIONS ENDORSEMENT

In consideration of the premium charged, it is agreed that the following special provisions (indicated by an "X") apply to this policy.

### SCHEDULE

☒ Bodily Injury and Property Damage Liability Deductible Endorsement

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| Bodily Injury Liability | $ 500 | per claimant |
| Property Damage Liability | $ 500 | per claimant |
| Personal Injury Liability | $ 500 | per claimant |
| Advertising Injury Liability | $ 500 | per claimant |

☒ Minimum and Advance Premium Endorsement
Minimum Premium $ _____$750.00_____

☒ Minimum Earned Premium
Minimum Earned Premium _____25_____ % of the original premium.

## BODILY INJURY AND PROPERTY DAMAGE LIABILITY DEDUCTIBLE ENDORSEMENT

APPLICATION OF ENDORSEMENT (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage," however caused.):

1. Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages, and the limits of insurance applicable to "each occurrence" for such coverages will be reduced by the amount of such deductible.

"Aggregate" limits for such coverages shall not be reduced by the application of such deductible amount.

2. The deductible amounts include all legal and loss adjustment expenses.

3. The deductible amounts stated in the Schedule apply under the Bodily Injury Liability or Property Damage Liability Coverage, respectively, to all damages because of "bodily injury" sustained by one person, or to all damages because of "property damage" sustained by one person, any organization, or association or any individual member of any organization or association as the result of any one "occurrence."

UTS-128g (10-94)    Page 1 of 2

4. The terms of this insurance, including those with respect to our right and duty to defend any "suits" seeking those damages and your duties in the event of an "occurrence," claim or "suit," apply irrespective of the application of the deductible amount.

5. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

## MINIMUM AND ADVANCE PREMIUM ENDORSEMENT

Item b. of the **Premium Audit Condition** (under SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS) is changed to read:

b.   Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable to us on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured, subject to a minimum premium **listed in the Schedule above** . For purposes of this policy, the terms advance premium, audit premium, earned premium, and minimum premium are defined as follows:

Advance Premium — The premium that is stated in the policy declarations and payable in full by the first Named Insured at the inception of the policy.

Audit Premium — The premium that is developed by calculating the difference between the Advance Premium and the Earned Premium.

Earned Premium — The premium that is developed by applying the rate(s) scheduled in the policy to the actual premium basis for the policy period.

Minimum premium — The lowest premium for which this insurance will be written for the policy period.

## MINIMUM EARNED PREMIUM

If this policy is cancelled at the request of the INSURED, the total retained by the Company shall not be less than the percentage of the original premium **listed in the Schedule above.**

_____    /_____
AUTHORIZED REPRESENTATIVE                        DATE

UTS-128g (10-94)                Page 2 of 2

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
FEDERAL INSURANCE COMPANY )
)
Plaintiff, )
)                    Case No. 1:06CV00157
v. )
)
TIMOTHY OLAWUNI, et al. )
)
Defendants. )
)
_____ )
)
TIMOTHY OLAWUNI, et al. )
)
Defendants/Cross-Plaintiffs, )
)
v. )
)
ALEA LONDON LIMITED )
)
Cross-Defendant. )
)
_____ )

## DECLARATION OF GREGORY KASTENDIKE

I, GREGORY KASTENDIKE, hereby declare as follows:

1.      I make this Declaration in support of Cross-Defendant Alea London Limited's ("Alea") Motion for Summary Judgment In Respect To The Cross-Claim. I am over the age of 18, competent to testify, and have personal knowledge of the facts set forth herein. I am employed as a Claims Representative for Johns Eastern Company. This Declaration is based on my personal knowledge of the facts, and the business records of Johns Eastern Company.

2.      I took Defendant/Cross-Plaintiff Timothy Olawuni's recorded statement on November 7, 2006, during the course of my investigation of the incident which took place on August 9, 2005 at the address of 1425 5th Street, NW, Washington D.C.

-1-

3.    Attached as Exhibit A to this Declaration is a true and correct copy of the transcript of Defendant/Cross-Plaintiff Timothy Olawuni's recorded statement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23 day of July, 2007.

Gregory Kastendike

-2-

# ATTACHMENT A

2

## RECORDED STATEMENT

**NAME:**          **Timothy Olawuni**

**DATE:**          **November 7, 2006**

**ADJUSTER:**      **Greg Kastendike**

**JECO FILE #:**   **325006316**

GK:   Here begins the recorded statement for JECO file 325006316. This is a recorded statement taken in person on November 7, 2006 at the location of 8701 Georgia Avenue, Suite 600 in Silver Spring, Maryland 20910. This is regarding an incident that occurred on 8/9/2005 at the location of 1427 5th Street, N.W., Washington, D.C. 20001. Present in this room and taking the recorded statement is our insured Timothy Olawuni and Pedro Dominguez who is his contractor. Also present in this room is our insured's attorney. If you would please identify yourself?

AA:   Alexander Agiliga.

GK:   Thank you.

MN:   Mary Rosa Ozee Nwadike, the attorney for Timothy Olawuni and Pedro who is the foreman and supervisor.

GK:   Thank you.

CA:   Chris Ahaghotu.

GK:   Okay. Does everybody understand that this conversation is being recorded?

ALL:  Yes.

GK:   And Timothy as well?

TO:   Yes.

GK:   Okay. And does everyone understand or do I have everyone's permission?

ALL:  Yes.

GK:  Okay. I am going to read back some information Tim that you just previously
gave me. Listen closely, if anything is incorrect, we'll make a change at that
point and then we're just going to move on. You stated your name was Timothy
Olawuni, last name OLAWUNI.

TO:  Right.

GK:  Your home address is 711 Seek Lane, Takoma Park, Maryland 20912. Home
phone number 301-445-3182. You are currently self employed by Tim and Flo
Realty with a business address of 5614 5th Street, N.W., D.C. 20011. Business
phone number 202-291-5122?

TO:  Right.

GK:  Unknown Tax I.D. and did not want to give social security number. We are
discussing an incident that you stated occurred at 1427 5th Street, N.W.,
Washington, D.C. 20001. This incident had damages to 1425 5th Street, N.W.,
Washington, D.C. 20001. This is a building that you do not own but you are
working on and you said it is owned by Timothy Adeyami.

TO:  Adeyami.

GK:  Adeyami, Can you spell that?

TO:  ADEYAMI.

GK:  Adeyami, okay. Everything correct so far?

TO:  Yes.

GK:  Okay. Could you give me a description of the building prior to the loss actually
occurring?

TO:  Which building?

GK:  Let's go with 1427, the one that you were working on.

TO:  1427 when we approached the project made some renovation and some addition.
Based on the permit that we received from the District of Columbia, we were
allowed to do some addition to the property and also renovation. What we

discovered was that the property has some trouble that is some of the bricks and mortars are not strong. So we have to get rid of some of the wall, some from the back side and some on the side of the building. Now the one in the front we also discovered that it is like standing in isolation from the party wall.

GK:    What do you mean standing in isolation?

TO:    That is the connection between the party wall with the front to the far side, is not connected.

GK:    And this is the party wall at 1425?

TO:    Yes. This is the party wall between 1425, so the wall, our own wall and my wall and the property 1427 wall, they are not connected, supposed to be connected. But because of the application of the wall party, it's kind of share, there's a share.....

GK:    So the front wall of 1427 was not connected to the party wall between 1427 and 1425?

TO:    Yes, 1425 is not a wall connected.

GK:    Okay. So it's basically disconnected from the entire row?

TO:    Exactly.

GK:    Okay.

TO:    So we noticed this problem, the engineer advised us what we need to do to make it secure so he indicate what we need to do was to put a brace from the straight side secure the facade of the party and since our goal is to underpinning that is the underpinning is to create space for basement.

GK:    Okay. So you secured the front and you were in the process of under pinning

TO:    Yes.

GK:    The party walls.

TO:    The party walls, exactly.

GK:    To secure them so you can begin digging the basement?

TO:    Yes.

GK:    Okay. So the building prior to any construction it was how many floors, were the floors there, all the walls there?

TO:    Yes. We have three, one two, two floors.

GK:    Okay. And it had four walls front rear, had four walls front rear both sides, both elevations?

TO:    Half of the property is one level up, that is off the back is one level up to the front, you have two levels.....

GK:    You have two levels in the front and one in the back?

TO:    Exactly.

GK:    Okay. But I mean it was a complete house with roof and walls and everything before you got started?

TO:    Yes, yes complete house.

GK:    Okay. And you guys basically gutted the entire place?

TO:    Yes.

GK:    Just created a shell of the....

TO:    Exactly.

GK:    Everything but the front elevation of the house?

TO:    Right.

GK:    Okay. And so your basic job when you were hired to do it was to do what originally, before any of the problems?

TO:    To do the renovation and the addition. Now the addition we are talking about is the half part of the property to put one level.

GK:    Okay. What were the renovations?

TO:    The renovations is to make sure the floors are secures and the drywalls we have this old drywall kind of thing. We want to remove those drywall and put new drywall and keep the structure at least.

GK:    Okay, okay.

TO:    Then we start discovering that the property was...

GK:    Were you informed of any problems before going into the project?

TO:    The only I was able to discover is when we are removing some of the.......

MN:    When you were informed before you walked into the job?

GK:    Yeah I mean....

TO:    Like some of the.....

GK:    I'm assuming you were hired by Timothy right?

TO:    By Adeyami.

GK:    Yeah, Adeyami and he told you to basically do the renovations and the additions?

TO:    Yes.

GK:    Did he tell you about any structure problems or anything like that at any time?

TO:    No, no because at that time you can't see anything, you cannot see.

GK:    Okay. Do you know if he was aware of anything?

TO:    Oh yeah.

GK:    He was aware?

TO:    He was aware.

MN:    Do you understand the question? Was he aware at the time ...

TO:    No he wasn't aware.....

MN:     .......because your now saying there's no way he could have said.....

TO:     Yes, he wasn't aware.

GK:     Okay.  When he hired you guys he didn't know that.....

TO:     He didn't know about this ..... that's for sure.

GK:     Okay.  So renovations and additions, and you said the renovations were just basically some drywall repair; make sure everything is secure.

TO:     Drywall repair, you know the floors are not sticky.

GK:     Okay.  So what ever needed fixing....

TO:     Just take care.

GK:     Were you asked to put a basement in the house at all?

TO:     Yeah as part of the addition.

MN:     Part of the addition.

GK:     As part of the addition?

GK:     Did you have a specific time frame at all for the job, when it was going to begin, when it was going to be completed?

TO:     Yes, the time frame we is just have a discussion because we don't know what we want.  We don't have exact time but at least within 6 months.

GK:     Do you know the start date when you guys actually started work?

TO:     I don't know the exact date.

AA:     Do you know what month?

TO:     I think it's late sometimes late, I don't know.

GK:     Okay.  Yeah, if you don't know an answer to any of these questions, you can just say your not sure.

TO:    Yeah, I don't know, I don't know for sure.

GK:    Okay. So contracted for the job repairs was the company Tim and Flo Realty, right?

TO:    Yes.

GK:    Okay. Did you have any sub-contractors at all?

TO:    At the time I had to get one guy that would take care of the demolition part, some of the things like the drywalls and some of the things like....

GK:    So you contacted a demolition?

TO:    Yes.

GK:    Do you know the company name?

TO:    It's not a company, just I know the one.

GK:    Just a guy you know very well. Okay, do you have a name?

TO:    Pena

GK:    I'm sorry?

TO:    Pene.

GK:    Gotcha, and last name.

TO:    Guan

GK:    Okay. Do you have a phone number for him?

TO:    I can check. I have to give it to you later.

GK:    Okay. Who were the supervisors on the job? Supervisors?

TO:    Myself.

GK:    Yourself, anybody else?

TO:     At the time of demolition?

GK:     Any supervisor, let's start with the time of demolition.

TO:     I have Pedro.

GK:     Pedro. Pedro what is your phone number?

PD:     703-450-8973.

GK:     Okay. And I took some information from you previous and I'm going to read
        back as well. Let me know if anything is incorrect, okay. Your name is Pedro
        Dominguez, your current address is 806 Nettle tree Road, Sterling, Virginia
        20164. And you were hired by Tim & Flo Realty. Do you have a specific
        company name at all or is that your employer, Tim & Flo Realty?

PD:     Right.

GK:     Okay. Now previously before did the property have a basement at all?

TO.     No.

GK:     Did it have a crawl space?

TO:     Yes.

GK.     Okay. In your own words were you go ahead and describe what are the issues
        that you ran into when you started the renovations, explain that to me again. You
        noticed that the front façade, the front elevation was not connected to either party
        wall so you secured that, what about anything else?

TO:     Most of the problem you are able to see when you started moving all these things,
        I think there's another name for it, it's not the drywall like a plaster. We were
        removing it from the break from the wall, then we were able to see....

GK.     This is on the party walls.

TO:     The party walls both sides.

GK:     And this is where you saw that the brick wasn't secure

TO:   we are not go down, some of them lose the connection the mud

GK:   The mortar in between

TO:   Is not holding.

GK:   Okay. Did you take this up with the owner?

TO:   Yeah, I take this up with the owner and I called the engineer to take a look at where we have our plan

GK:   And did the engineer put together a protocol for what needs to be done?

TO:   Yes.

GK:   Okay. Do you have that with you at all?

TO:   No, I don't he looked to the sides and look back and there's made some recommendations

GK:   Okay and you just made recommendations? What recommendations did he make?

TO:   One of the recommendations is to brace the front wall, brace the front wall that I hang at that property.

GK:   The rear wall?

TO:   The rear wall we know that cannot support any other of the other one.

GK:   That comes down?

TO:   That comes down.

GK:   Okay.

TO:   So we are left with the front wall and the party wall since the connection is doing the party wall and outside are not there, that is the concern for this recommendation

TAPE TURNED OVER

GK:    Okay, here's a continuation, this is side two of tape one for JECO file 325006316. I just switched sides, was there anything during the break that we mentioned that we want to add?

ALL:   No.

GK:    Okay. Were all in agreements with that? And we just ended up talking about you securing the front, facade or the front elevation so you guys could start the underpinning?

TO:    Yes.

GK:    Okay. So the engineer said okay if you did that you can go ahead and start with the underpinning. What was his concern that with having the gap in between the party wall and the front wall. Did he ever come up with a solution for that or?

TO:    Yeah well since he said if you brace it from the front that should help us.

GK:    Okay. So who was doing the work for the underpinning of the basement?

TO:    Well, Pedro is one of my supervisor, he know what to do because

GK:    Okay. So Pedro you were out there doing the work for the underpinning?

PD:    Correct.

GK:    How far did you get?

PD:    If I can recall at the time we were just in the process of cleaning it up and digging up the front of the wall and see how far below the surface was the bottom of the system and the same party wall there was two fireplace and chimney.

TO:    Two chimney.

PD:    Attached to the wall itself and we were in the process to digging the trenches around the wall and I believe that at the time because of the weight of the chimney and all that stuff fall down since the wall was not attached to the façade, it was separated.

GK:    Okay. So yes it's the party wall to 425 was not attached to either....

TO:    To the façade.

GK:    To the front elevation then it basically gave way. What was the process that you guys were going to use to underpin the basement?

PD:    Follow the drawings that we had at the time and the recommendations from the structural engineer.

AA:    Who is the structural engineer?

PD:    Wainwright

GK:    The structural engineer was Wainwright.

TO:    That the party wall doesn't have foundation….

GK:    Yeah.

TO:    No foundation…..

GK:    No concrete foundation, just on…..

TO:    No concrete foundation, just put up the brick on the dock.

GK:    Okay. Is this something you've dealt with before, have you done a basement before or installed a basement in a row home, this type of situation. What about with just a dirt on, the brick laying on a dirt with no foundation. Is this the first time?

MN:    Is this your first time?

PD:    No, as far as the brick we don't know. We have no footing.

TO:    Is this the first time

PD:    No. What I meant was the wall didn't have no footing was the first time, but as far as not having no footing is the wall itself, it was separate.

GK:    What did the protocol or the engineer report state on how to go about with starting to dig the base, did they give you instructions on how to support that party wall or was it just the pressure against the front elevation was going to support?

TO:    The front elevation support would help as he recommended so when we do that, that should be fine.

GK:    That should be fine.

TO:    Yes, cause before he came there to do all these estimate or analysis, we did the test hole they call it test hole, that is you want to see how far you know by just digging little parts just to see how far you can go down

GK:    Okay. So you began the digging to inspect for the foundation?

TO:    Yeah just to see what is the foundation, how far does it go down.

GK:    And how far did you get?

TO:    By the time we stopped like twenty hours so .....

GK:    How many feet would you say?

TO:    About two and a half feet.

GK:    Two and a half, Oh I'm sorry I didn't get that.

TO:    We was able to see that it's down there on the mark, on the dot.

GK:    What did you use to dig?

TO:    Just a......us, digger

PD:    We used a small machine to help out....

TO:    What is the name of that digger

PD:    A small excavator.

GK:    Excavator.

PD:    Mini.

TO:    Is not the machine.

GK: Is that like a bobcat of some kind?

PD: Well it was to clean the dirt out but we were doing it manually by hand.

GK: Okay, so you were doing it by hand with shovels?

PD: With shovels.

TO: Shovels and what is this digger?

GK: And then you used just a small machine to remove the ground.

??: Yeah to get the dirt away from the area.

TO: machine?

GK: Okay. At the time that you guys were digging this two and a half feet, did you put up any kind of supports or anything like that or was it just a test?

PD: It was basically a test and that was how far we went.

TO: the test hole, based on the drawing, the drawings stated that every four feet we dig four feet, then miss 4 feet.

GK: So you only dig four feet at a time?

TO: Yeah, you dig four feet then you keep the soil in between.

GK: Then you keep....

TO: the soil no you don't dig unless four feet, it's like that because the soil is so soft that part because if you dig all the way can expect something to happen fast.

GK: Okay. Was that the plan altogether, the entire way or just to get started?

TO: That is the approach.

GK: Okay.

TO: That is the approach, based on the drawing. What happens is what is on the drawing.

GK:   From the engineer?

TO:   Yes.

GK:   Okay.  And did you follow that?

TO:   Yes.

GK:   To the "T"?

TO:   Yes.

GK:   Okay.

TO:   And we have no choice, this guy would come and check.

GK:   So you got the test at two and a half feet of the test down, is that when the collapse happened?

TO:   No.  That was after. After the test hole or whatever that is when he came to check.

GK:   To check.  And what did he say?

TO:   That is when he made the recommendation that façade.........

MN:   ?...........

TO:   So that's when he made the recommendation?

TO:   Yeah, that's when he made the recommendation to secure the façade and follow the drawings.

GK:   Okay, then you continue to follow the drawings and how far along did you get?

TO:   About just one part of the...how far?

PD:   When we were ready to start processing we had cleaned out the debris that was there from the demolition or whatever.  We went in and where we were supposed to start, four feet and then go the other four, we were working and like at 12 foot section basically, you know, four, four, four so that's what we were doing.  The first four feet skipped the other four and then work on the other four, so we can get to the bottom of the wall.

GK:   Are you taking out four feet along the entire length of that home?

PD:   No.  Open up four feet.  The first section was skip four.....

GK:   Okay, I got you there....

PD:   And then the other four.

GK:   Yeah, I mean how.....

PD:   Well the four feet working distance in front of the wall.

GK:   Yeah.

PD:   That's what we were doing.

MN:   But you can't go beyond two and a half because.....

TO:   Oh you want to know how deep?

GK:   How deep?

PD:   It was to the bottom of the wall about two and a half.

GK:   About two and a half feet.  So you go four feet, two and a half feet, by what was the length of that?

TO:   The length of the hole?

GK:   So you go four by four by two and a half?

PD:   On the underpinning process..

MN:   Can we go off the tape so we can get a clear thing and we put it back on the tape, it's all mumbo jumbo now.

GK:   I'll clear it up again.

MN:   You'll clean it up.

GK:   Yeah.

MN:    Well, then just explained to you that the engineer said, first of they dig two and a half...

GK:    Two and a half deep, we got that.

MN·    ....... They got to the bottom, so you can't go beyond two and a half.

GK:    Got two and a half.

MN:    So based on the results of the tests that the engineer did, we came out with recommendations, he said do the underpinning in the front, dig four, keep four, dig four, keep four, so we know you cannot go beyond two in depth so that's why 3 and 4 in length , yes so that's what it is...so this is the wall,.....this way four foot....

GK:    How much out this way?

TO:    That's way, look at it this way.  This is the hole..

GK:    That is the left elevation of the of the risk

TO:    Yes, exactly.  You have to dig four here.

GK:    I got it.

TO:    And then you dig four.

GK:    I mean but there's a length, a width and a height when you dig.  Is it just a depth of the shovel or is it...

TO:    The length, the length is four, the deep is two and a half, that's where we get to the final.  Alright so when that is dug, the next will be to see how to put the foundation like re-enforced concrete at the ground at the party wall.

AA:    This is the wall right, we have feet here so the question is how much out here?

GK:    Yes.

AA:    Because we have four feet here, you have two and a half deep how much outside?

GK:    Okay.  So here we go now we dug two and a half feet down, were going four feet wide and were going a foot or two back.  Okay.  Twelve to eighteen inches away from the wall.

TO:    Exactly

GK:    Okay.  So that's what your doing, and then you skip four feet and then you do the same thing for next four feet?

TO:    Exactly.

GK:    Okay.  How many sections did you get down of four foot?

TO:    We couldn't go that far.

GK:    Because, I mean..

PD:    The first four skipped four, then we were working on the other floors.

GK:    So your working on the second set of four and your plan is to basically fill that with concrete?

PD:    No, that was not even underneath the walls it was in front, so we just now getting ready to go underneath the wall.

GK:    You hadn't even gone underneath the wall?

PD:    Not at all.

GK:    Okay.  So once that was all going to be completed, what was going to take place next?

PD:    To go underneath the wall

GK:    To go underneath the wall and crawl into, and put in your supports in the four foot section that's in between would support it, okay.  So, you never even made it underneath the wall before it collapsed.  Now did it collapse in one of the open four foot sections or?

PD:    The four side.

GK:    On the first one or second one?

PD:     I don't recall.

GK:     You don't recall, okay.  Alright, so are we clear on that?

ALL:    Yeah.

AA:     We have dimensions that we dig in that house.. They have not done…

TO:     That is our goal to be able to secure foundations.

AA:     What is this underpin?

TO:     That is how to become part of the wall.  go down and take most of it out at that time the foundation will be there and also be able to go down basically trying to create basement.

GK:     Now, Pedro were you there when it actually happened?  Were you there Tim?

TO:     No.

GK:     No you were not.  Okay, but you were.  This happened in the morning, evening, middle of the afternoon?

PD:     It was morning hours, I don't recall the time.

GK:     Okay and what was going on exactly when it happened?

PD:     We were doing the digging and a neighbor from 1425 came out and said she heard some something that was, some cracking noise and that's when we realized that something was giving and the only thing were going to have to do is what we did is move out, just get away from it.

GK:     Any large vibrations going on at the time.  Were you using any heavy equipment to dig with?

TO:     We were using manual

GK:     Just…..Manually.  I mean there was nothing else going on at the time.

TO:     The party wall can't get the machine there.

GK:   Okay. And then whereabouts in the house of 1425 did it collapse?

TAPE TURNED OVER

GK:   Here is a continuation of JECO file 325006316. This is tape number two. To everybody present in the room was there anything that we mentioned when switching the tape that you want to add?

ALL:  No.

GK:   Just in the process of asking you where exactly did the collapse from?

MN:   Which house?

GK:   Let's go with 1425. That's the house that's adjacent to the one that you were working on, right?

TO:   They share a party wall.

GK:   Yeah, they share the wall. What did you do after the collapse?

PD:   Run, get out of the way.

GK:   I mean you heard it going, you heard it collapsing and then you took off?

AA:   He said, hear anything, as he said the neighbor came out so we did not hear the cracking.

PD:   No, we did not.

GK:   Okay, did it happen just as she was talking to you or was it an all of sudden thing or was it just a slow?

PD:   Slow.

GK:   Slow. And how many people were with you at the time?

PD:   It was just 2

GK:   And Tim when did you hear about it, when were you informed of it?

TO.    I believe that same day because I travel and we have time difference, just call me that something happened. So I hear about because we have a six hour difference in the country that I went..

GK:    Okay. And who told you?

TO:    Pedro, I believe Pedro told me, I think my wife told me.

GK:    And do you have any reason to believe, Pedro why do you think the building collapsed?

PD:    I believe the integrity of the structure.

GK:    The structure of the party wall?

PD:    Yes.

GK:    Okay. Was the police or fire department called?

PD:    Yes.

GK:    Do you know who?

PD:    No.

MN:    Do you know who called them?

GK:    Do you know who called them?

PD:    No.

GK:    And you don't know who responded? I'm sorry I thought you were asking him. Anybody injured?

PD:    No.

GK:    And nobody from your crew was injured at all? And did the engineer from Wainwright come out that same day or shortly after?

PD:    I don't know, I don't remember.

GK:    Okay. Is there anything that you want to add at this time Tim?

TO:    Well yes, the structural is the issue in this matter. We don't know what is going to happen, but we know that the structure is not strong cause because all the walls they are not together, we just push it and should be able to…

MN:    They took measures to

GK:    And Pedro is there anything you want to add at this time?

PD:    No.

GK:    Anybody else?

AA:    You mentioned about chimneys, where was the chimney?

TO:    They were on the party wall.

PD:    On the party wall and they said it's two of them.

GK:    These are chimneys for which unit , for which address?

TO.    1427.

GK:    27?

TO:    They are attached to the party wall.

GK:    Okay. So there were pre-existing chimneys?

TO:    Pre-existing.

GK:    Okay. Still functional?

TO:    No.

GK:    No, okay and you believe that the weight of those chimneys might have had something else to do with it as well?

TO:    Might…..

GK:    There were two of them, one on each floor or next door.

TO:   No, it's just one down here, one down there.

PD:   It was all the way up, the entire height.

GK:   You had a brick chimney going all the way out.

PD:   They were built with the same brick in the same wall.

MN:   There was a fireplace in 1427 and a fireplace in 1425, is that what it is?

TO:   No.

MN:   The two fireplaces for 1427.

GK:   First floor, second floor?

PD:   On the first floor, on the roof.

GK:   Two chimneys on the first floor all the way to the roof. So not above each other, next to each other?

TO:   Next to each other, just like this.

GK:   How much separated the two of them?

PD:   Oh, about, probably four to six feet.

GK:   Is that where it kind of collapsed in?

PD:   Yeah one towards the front first.

GK:   Okay. And do you know if there was any excavation in between those two?

PD:   I just know it was two of them, I know one was towards the front.

GK:   Okay. Anybody have anything else?

MN:   Pedro how long have you been doing this kind of work, like twenty years, two years?

PD:   About fifteen.

MN:   About fifteen years, and you very familiar situations like this and property?

AA:   Do you have license to do the work?  Do you have license do this type of work you do?

PD:   At the time with Tim I did not.

AA:   So you're not independent you were using his home improvement licenses.

GK:   Are we good?  Okay, well here ends the recorded statement for JECO file 325006316.  This was a recorded statement taken in person on November 7, 2006 at the location of 8701 Georgia Avenue, Suite 600, in Silver Spring, Maryland 20910.  Tim, did you understand that this conversation was being recorded?

TO:   Yes.

GK:   Everybody else did you understand it?

ALL:  Yes.

GK:   Okay Tim did I have your permission?

TO:   Yes.

GK:   Okay, everybody else?

ALL:  Yes.

# EXHIBIT 3

# Law Offices of
# MaryRose Ozee Nwadike

*8701 Georgia Avenue, Suite 600*
*Silver Spring, Maryland 20910*
*(301) 565-2424*
*Fax: (301) 565-2426*

## FAX TRANSMISSION COVER SHEET

*Date:*      November 27, 2006

*To:*        *Attn. Gregory A. Kastendike*
             *Johns Eastern Company, Inc.*
             *7135 Minstrel Way, Suite 102*
             *Columbia, MD 21045*

*Fax:*       1(410) 381-4894

*Re:*        **Federal Insurance Company v. Timothy Olanwuni, et al.**
             U.S. District Court for the District of Columbia, Case # 1:06-cv-00157 (PLF)
             Your File Number ALTE003493 Jeco Number 325006316

*Sender:*    *MaryRose Ozee Nwadike, Esquire*

*YOU SHOULD RECEIVE 19 PAGES, INCLUDING THIS COVER SHEET. IF YOU DO*
*NOT RECEIVE ALL THE PAGES, PLEASE CALL (301) 565-2424*

***CONFIDENTIALITY NOTICE***

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.

REPORT

STRUCTURAL INVESTIGATION REPORT
WALL COLLAPSE
1425 5TH STREET, NW, WASHINGTON, D.C.

Submitted by:
Mehta Consultants, Inc.
600 Reisterstown Road
Baltimore, Maryland 21208

Nov. 10, 2005

Table of Contents                                                 Page

1. Objective                                                          3
2. General Description of Existing Properties                        3,4
3. Technical Discussion on Soils Bearing Capacity                    5,6
4. Reasons for the Wall Collapse                                     7
5. Conclusions                                                       8
6. Appendix
   •  SK-1:  Keyplan of Properties
   •  SK-2:  Excavation Details prior to wall collapse
   •  SK-3:  Shear Failure of Soils
   Photographs:  1 through 6

11-27-2006 2:38PM     FROM LAWFIRM OZEE NWADIKE 301 565 2426                    P. 4

## 1. OBJECTIVE

The objective of this report is to provide the following:

- To provide General Description of an existing townhouse
- To provide Technical Discussion, regarding how the excavation affected soils bearing capacity
- To provide reasons for the collapse of the wall
- To provide conclusions

## 2. General Description of Existing Properties

2.1  Property at 1425 5th Street

The existing house at 1425 5th Street, NW, Washington, D.C. was a residential house for Ms. Denise Washington, prior to the collapse of the party wall on North side. The townhouse has three (3) stories at the front, 17'-8" wide and 20'-0" long, and two (2) stories at the rear, 13'-4" wide and 40'-0" long. It should be noted here that this house does not have the basement. It has very little *crawl space* of about 2" to 4" below floor joists. The floor framing consists of wood joists 2"x11" @ 16".

2.2  Property at 1427 5th Street

Immediately, north of Ms. Washington' property, there is an "open lot", owned by Mr. Timothy Olawuno, who wants to construct three (3) story house with a basement.

The firm, Tim & Flo Construction Realty is the contractor on this project. Mr. Timothy Olawuno is also one of partners of Tim & Flo Construction Realty.

2.3  Rowhouses

It is a common practice that the wall between two houses is considered as a "common party wall", supporting floor and roof loads from each side.

The information regarding properties above is described on the sketch SK1. Also, the front view of Ms. Washington's house is given in the photograph # 1.

---

Project: Structural Investigation Report, Wall Collapse, 1425 5th Street, Washington D.C.

2.4     <u>Design Loads on Common Property wall</u>:

We calculated the "design live load" per International Building Code, prior to the wall collapse, and provide results below.

We considered following loads:

- Dead loads of floor and roof levels:  10 lbs/sq.ft.
- Live loads:
                                        40 lbs/sq.ft for Living Room
                                        30 lbs/sq.ft. for Bed Rooms
                                        30 lbs/sq.ft. at roof level

Since there was no snow at the time of the wall collapse, we did not consider live load at the roof level in our calculations. Also, we considered 50% of design live load at floor levels.

The summary of loads is provided below.
- Roof Level:               88 lbs/ft
- Third Floor:              221 lbs/ft
- Second Floor:             221 lbs/ft
- First Floor:              265 lbs/ft
- Wall load                2625 lbs/ft; 29'-2" high x 9" wall at 90 lbs/sq.ft
Total load at bottom of wall    3420 lbs/ft

Since the wall did not have the footing, the bearing stress on soils is equal to 3420 lbs/9" = 4560 lbs/sq.ft.

11-27-2006 2:38PM     FROM LAWFIRM OZEE NWADIKE 301 565 2426                    P.6

### 3. Technical Discussion on Soils Bearing Capacity

#### 3.1 Soils Bearing Capacity

Generally, every structure needs to be supported on soils, commonly referred as the "ground". With the information of soils bearing capacity, the footing is designed to support the building loads. It is not the objective of this report, nor of the writer, to fully explain all technical terms for soils bearing capacity.

However, the intent is to provide the "design concept", and relate it to the excavation that the contractor made.

#### Confinement Concept

Generally, "soils" is confined or restrained on all sides, meaning that the soils can not move in any direction under the load. If the "confinement" is removed, then almost all the capacity for soils is lost. The soils that is at the site is basically cohesive soils with clay. Once the clay loses its confinement, it loses the capacity by about 80%. In engineering terms, having the soils removed below the footing is called as *undercutting the footing*. This means that the footing would collapse after soils is removed below the footing. This concept is briefly explained below.



A simple example will explain the "confinement concept", which explained below.

Example: Soils in a glass



Diagram 2A: Soils in a glass shall take the load. The glass is working as a "confinement" to soils, which is inside the glass.

Diagram 2B: Once the glass is removed, the soils shall develop an "inclined surface", depending upon engineering properties. However, the top surface A-A shall come down by a few inches, thus causing the plate come down. In our case, as soils is removed below the bottom and in front of the wall, the wall will come down

11-27-2006 2:39PM     FROM LAWFIRM OZEE NWACIKE 301 565 2426                          P. 8

3.2     How the Excavation affected Soils Bearing Capacity?

General

We took measurements of the excavation on 10/28/05, and prepared a sketch SK2. The sketch is based upon our field measurements, and also a photograph # 6, taken by Ms. Washington on the day of the wall collapse, Aug. 09, 2005.

Effects of Excavation on soils bearing capacity

It is very clear from the photograph # 6 that the contractor removed soils to the existing wall surface and 5'-0" below the bottom of the wall, affecting the stability of the soils. Thus, the contractor removed "confinement" from the bearing the capacity. This resulted into a very high bearing pressure of 22,800 lbs/sq.ft., which can not be resisted by soils that is present at the site.

As a result, the shear failure occurred on the back side of wall, due to which the soils moved towards the excavation pit. Please see sketch SK-3 for this explanation.

The normal construction practice in this situation would be to provide an excavation in about 4'-0" length to new footing elevation, construct a new footing and a new wall to the underside of the existing wall, with dowels. This is referred as "Underpinning Method".

It is very clear from the photograph # 6 that the contractor did not use a standard construction method, "Underpinning Method". The soils was excavated next to the existing wall for about 12'-0" length. This conclusion is based upon our field survey on 10/28/05. Please refer to photograph # 4 for bricks at this elevation.

#### 4. Reasons for the Wall Collapse

General:

The common wall between properties # 1425 & 1427 collapsed on Aug. 09, 2005. As the wall collapsed, three floors and the roof also came down with the wall, since the floor and roof framing is supported on the wall. Please see photographs # 2 & #3, showing the collapse of the wall. The photograph # 5 shows the "end portion" of the wall being *peeled away* from the corner, as the "center portion" of the wall went down.

Reasons for the wall collapse

The contractor removed soils of about 5'-0" depth below the existing wall, and in front of the wall for about 12'-0" length. This is shown in the photograph # 6.

Because of an excavation below the bottom of the wall, it created the following scenario, which led to the collapse of the wall.

1. Confinement to soils below wall removed
   As explained in section (3), the bearing stress on soils increased from 4560 lbs/sq.ft to 22,600 lbs/sq.ft, leading to the "shear failure" on the inside face of the wall per the sketch SK3. Also, "shear failure" is marked on the photograph # 5.

2. No lateral support to soils on inside of the wall
   We believe that soils behind the wall and below the bottom of the wall became *loose*, since the soils in the front of the wall was removed. As a result, the soils behind the wall became loose, and fell through an excavation depth 5'-0".

---

Project: Structural Investigation Report, Wall Collapse, 1425 5th Street, Washington D.C.
Page 8 of 9

### 5. Conclusions

5.1 The contractor excavated soils for about 5'0" below the bottom of the wall, and in front of the existing wall for about 12'-0", which, in our opinion, created unstable condition for soils and higher bearing pressure, thus causing the collapse of the wall.

Therefore, in our opinion, the contractor, Tim & Flo Construction Realty, is responsible for the collapse of the common wall, on which Ms. Washington's house was supported.



SUBJECT: KEYPLAN OF PROPERTIES

PROJECT: 1425 5th STREET, NW. WASHINGTON D.C.

PROJECT NO.: 00538

DATE: 11/16/05

SKETCH SK—1

MEHTA Consultants, Inc.
800 Reisterstown Road
Suite 312
Baltimore, MD 21208

11-27-2006 2:41PM    FROM LAWFIRM OZEE NWADIKE 301 565 2426                    P. 12



FIRST FLOOR

1'-0"±

EXCAVATION NEXT TO
EXISTING PARTY WALL
ON 08/09/05

6'-3"±

BRICKS FOUND
ON 10/28
– SEE
PHOTOGRAPH
# 4

1'-0"±

1'-4"±    2'-0"±    10"±

FIRST FLOOR

1'-0"±

1'-2"±    2"±    EXIST. JOISTS
2"X11"@16"±

EXIST. CRAWL SPACE

9"

5'-1"±

BRICKS FOUND
AT THIS ELEVATION
DURING FIELD SURVEY
– SEE PHOTOGRAPH #4

BOTT. OF
EXCAVATION
ON 08/09/05

EXCAVATION DETAILS
PRIOR TO WALL COLLAPSE
3/4" = 1'-0"

BASIS OF THIS INFORMATION:

PHOTOGRAPH # 6 & FIELD SURVEY ON 10/21/05

| SUBJECT: EXCAVATION DETAILS PRIOR TO WALL COLLAPSE | PROJECT | SKETCH | MEHTA Consultants, Inc. |
|---|---|---|---|
| PROJECT: 1425 5th STREET, NW. WASHINGTON D.C. | NO.: 00538  DATE 11/16/05 | SK−2 | 800 Hamlershown Road Suite 312 Baltimore, MD 21208 |

11-27-2006 2:41PM    FROM LAWFIRM OZEE NWADIKE 301 565 2426    P. 13



SHEAR FAILURE OF SOILS
DUE TO EXCAVATION BELOW B/WALL
3/4" = 1'-0"

BASIS OF THIS INFORMATION:

PHOTOGRAPH # 5 & FIELD SURVEY ON 10/21/05

| SUBJECT: | SHEAR FAILURE OF SOILS DUE TO EXCAVATION BELOW B/WALL | PROJECT | SKETCH | MEHTA Consultants, Inc. |
|---|---|---|---|---|
| PROJECT: | 1425 5th STREET, NW. WASHINGTON D.C. | NO.: 0053B DATE 11/16/05 | SK-3 | 600 Reisterstown Road Suite 312 Baltimore, MD 21208 |

11-27-2006 2:42PM     FROM LAWFIRM OZEE NWADIKE 301 565 2426                    P. 14

Case 1:06-cv-00157-PLF     Document 15-4     Filed 07/14/2006     Page 13 of 18



Photograph No.1: Front View of Ms. Washington's House



**Photograph No.2:** Collapsed Wall



Photograph No. 3:    Collapsed Wall
End section *peeled away*, as central section
of wall fell through excavation



Loose Bricks

Photograph No. 4: Loose Bricks shown at about 5'-1"
below bottom of wall, indicating that
contractor dug soils below bottom and
in front of wall
- Having soils removed next to wall
caused collapse of wall.



Soils moved from the back
of wall, towards excavation
pit, indicating "shear failure"

**Photograph No. 5:** "Shear Failure" of soils at the back of wall

11-27-2006 2:46PM    FROM LAWFIRM OZEE NWADIKE 301 565 2426                P. 19



Excavation about 5'-1'' below
bottom of wall, and next to wall
caused collapse of wall

**Photograph No.6:** Indicating excavation below bottom
of wall, and next to wall

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY )<br><br>Plaintiff, )<br><br>v. )<br><br>TIMOTHY OLAWUNI, et al. )<br><br>Defendants. )<br>_____ ) | Case No. 1:06CV00157 |

| |
|---|
| TIMOTHY OLAWUNI, et al. )<br><br>Defendants/Cross-Plaintiffs, )<br><br>v. )<br><br>ALEA LONDON LIMITED )<br><br>Cross-Defendant. )<br>_____ ) |

## AFFIDAVIT OF DUANE K. THOMPSON

DUANE K. THOMPSON, being duly sworn, hereby deposes and says:

     1.     My name is Duane K. Thompson. I am over the age of 18, competent to testify, and have personal knowledge of the facts set forth herein. I am a partner in the law firm of Baach Robinson & Lewis PLLC, and in that capacity, provide legal advice and representation to Alea London Limited ("Alea") with respect to insurance coverage issues that arise from time to time in the Washington D.C. metropolitan area. I am making this Affidavit in support of Alea's Motion for Summary Judgment In Respect To The Cross-Claim.

     2.     On August 9, 2005, Alea appointed Gregory Kastendike of Johns Eastern Company to conduct an investigation of the damage to 1425 5th Street, NW Washington D.C. 20001.

     3.     Mr. Kastendike conducted a full liability adjustment with respect to Tim & Flo Realty/Construction Firm's ("Tim & Flo Realty") claim. A full liability adjustment includes: (1)

a full review of the policy to determine whether the loss is covered under the policy; (2) contact with the insured and claimant(s) in order to obtain recorded statements with respect to damages; (3) inspection of the premises; and (4) obtaining photographs of the premises.

4.     Alea engaged me to conduct a coverage analysis of Tim & Flo Realty's claim based on the information obtained by Gregory Kastendike during the course of his investigation of Tim & Flo Realty's claim with respect to the incident that occurred on August 9, 2005 at the properties located at 1425 and 1427 5th Street, NW, Washington, D.C.  I determined that Policy No. ALT 003493 did not provide coverage for the claim due to the clear and express terms of the Policy's Earth Movement Exclusion.

5.     On January 4, 2007 I sent a notice of denial of coverage letter on behalf of Alea to Alea's insured Tim & Flo Realty, Timothy Olawuni, Florence Olajide and their attorney, MaryRose Ozee Nwadike via certified mail.  Attached as Exhibit A to this Affidavit is a true and correct copy of my January 4, 2007 correspondence.

6.     Attached as Exhibit B to this Affidavit are true and correct copies of the certified mail receipts for MaryRose Ozee Nwadike, Esq., Timothy Olawuni, Florence Olajide and Tim & Flo Realty/Construction Firm.

I solemnly affirm under penalty of perjury and upon personal knowledge that the contents of the foregoing are true.

Date:  July 23, 2007

Duane K. Thompson

[SEAL]

Subscribed and Sworn to before me this 23rd day of July, 2007

Notary Public

Mia G. ENGEL
Notary Public, District of Columbia
My Commission Expires  My Commission Expires 8-14-2009

-2-

# ATTACHMENT A

WASHINGTON | NEW YORK | LONDON

# BAACH ROBINSON & LEWIS
PLLC

January 4, 2007

DUANE K. THOMPSON
duane.thompson@baachrobinson.com

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

Tim & Flo Realty /Construction Firm LLC
  c/o Mr. Timothy Olawuni
    Ms. Florence Olajide
5614 5th Street N.W.
Washington, D.C. 20011

| | | |
|---|---|---|
| Re: | Assured: | **Tim & Flo Realty/Construction Firm** |
| | Policy #: | **ALTE 003493** |
| | D/L: | **9 August 2005** |
| | Claimants: | **Federal Deposit Insurance Company, as subrogee of Denise Washington; Kim Hassan** |

Dear Mr. Olawuni and Ms. Olajide:

This firm represents Alea London Ltd. ("Alea") in connection with the claim by Tim & Flo Realty/Construction Firm LLC ("Tim & Flo") for defense and indemnification with respect to property damage claims resulting from excavation activity in Washington, D.C. on or about August 9, 2005. We understand that the following lawsuits have been filed in connection with such property damage:

*Denise Washington v. Timothy Adeyemi a/k/a Timothy Olawuni,* Civil Action No. 05-0008275, Superior Court of the District if Columbia.

*Federal Insurance Company as subrogee of Denise Washington v. Timothy Olawuni a/k/a Timothy Adeyemi, et al.,* Case # 1:06-cv-00157-PLF, United States District Court for the District of Columbia.

*Kim F. Hassan v. Timothy Adeyemi a/k/a Timothy Olawuni, et al.,* Civil Case No. 95-0008904.

Unfortunately, for the following reasons, we must regretfully advise you that Alea is constrained to disclaim any duty to defend and/or indemnify Tim & Flo in these matters.



**BAACH**
**ROBINSON**
**&LEWIS**
<small>PLLC</small>

Tim & Flo Realty/Construction Firm LLC
January 4, 2007
Page 2

---

We enclose a copy of Policy No. ALTE 03493 for your convenience. If a claim is made under the Policy, coverage is afforded subject to the terms, conditions, exclusions and endorsements of the Policy. Our determination that coverage is not present here is also informed by the allegations of the court complaints referenced above. You will understand, however, that we have no way of knowing whether these allegations are true or false, and in referring to those allegations, we do not mean to suggest otherwise. Our only purpose is to compare those allegations with the terms, conditions, exclusions and endorsements of Policy No. ALTE 03493.

The terms and conditions of the Commercial General Liability coverage's are set forth in Section I of Form CG 00 01 01 96, as well as other included forms. Among these is the Earth Movement Exclusion set forth on Form EZ-EXCL-01. In relevant part, this exclusion provides:

### Exclusion – Earth Movement

This insurance does not apply to "property damage" ... attributable or contributed to or aggravated by the movement of land whether caused by or resulting from natural forces or contributed to, in any way, by any work or operations performed by you or any contractor or subcontractor.

"Movement of land" includes but is not limited to any movement of earth or land, whether at the surface or below the surface and includes any movement of earth to a higher or a lower level, landslide, mud flow, mud slide, shearing, rising, settling or shrinking.

In addition, the Class Limitations set forth in the Policy's Supplemental Declarations refer to class code "91340," "Carpentry – Construction of Residential Property not exceeding three stories in height."

As you know, the Johns Eastern Company has conducted a thorough investigation of the underlying facts, which will not be repeated here except as pertinent to a discussion of the allegations made against Tim & Flo in the court cases. The material allegations in those cases assert various legal theories but are all premised on the movement of land as the cause of the property damage in question. For example, Federal Insurance Company has alleged that the common wall between the properties located at 1425 and 1427 5th Street collapsed as the result of "excavation work at the property located at 1427 5th Street...." *See* Federal Insurance Complaint, ¶¶ 8-10. Ms. Washington's suit likewise identified "excavation work" including "digging a trench" as the causative event. *See*

WASHINGTON | NEW YORK | LONDON



**BAACH ROBINSON &LEWIS** PLLC

Tim & Flo Realty/Construction Firm LLC
January 4, 2007
Page 3

Washington Complaint, ¶¶ 6-9. "Excavation work" is also the causative event identified in Ms. Hassan's Complaint. *See* Hassan Complaint, ¶¶ 9-11.

We also note that legal counsel to Tim & Flo has recently provided Johns Eastern with an analysis titled "Report, Structural Investigation Report, Wall Collapse, 1425 5th Street, NW, Washington, D.C." submitted by Mehta Consultants, Inc., 600 Reisterstown Road, Baltimore, Maryland 21208, dated November 10, 2005. In a section of the report titled "reasons for the wall collapse," Mehta concluded as follows:

> The contractors removed soils of about 5'-0" depth below the existing wall, and in front of the wall for about 12'-0" length....Because of an excavation below the bottom of the wall, it created the following scenario, which led to the collapse of the wall.

In light of the foregoing we must reiterate that Alea is constrained to disclaim coverage for this matter. Please note that no statement herein should be construed as a waiver of any rights, privileges, and/or defenses that Alea may have under the policy, including the right to supplement this letter as circumstances may warrant. Alea expressly reserves all rights.

Should you have any questions or wish to provide information you believe would bear on the issue of coverage, please feel free to contact me.

Sincerely yours,

Duane K. Thompson

DKT/mge
Enclosure

cc:     Mr. Timothy Olawuni                    Ms. Florence Olajide
        24 Kennedy Street, N.W.                7838-C Eastern Avenue, N.W.
        Washington, D.C. 20011-5225            Washington, D.C. 20012-1335

        Mary Rose Ozee Nwadike, Esq.
        Law Offices of Mary Rose Ozee Nwadlike
        8701 Georgia Avenue, Suite 600
        Silver Spring, Maryland 20910

WASHINGTON | NEW YORK | LONDON



Tim & Flo Realty/Construction Firm LLC
January 4, 2007
Page 4

bcc:   Beth Gauldin (Tapco) (via email - w/o enclosure)
       Nicola Scott (Miller Insurance) (via email - w/o enclosure)

# ATTACHMENT B

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Timothy Olawuni
24 Kennedy Street, N.W.
Washington, D.C. 20011-5225

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                         ☐ Addressee

B. Received by ( Printed Name )  C. Date of Delivery
                                  4/11/07

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☑ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _____ ☐ Agent ☐ Addressee<br>B. Received by ( *Printed Name*)   C. Date of Delivery 4/11/07 |
| 1. Article Addressed to:<br><br>Tim & Flo Realty /Construction Firm LLC<br> c/o Mr. Timothy Olawuni<br>  Ms. Florence Olajide<br>5614 5th Street N.W.<br>Washington, D.C. 20011 | D. Is delivery address different from item 1? ☐ Yes<br> If YES, enter delivery address below: ☑ No |
|  | 3. Service Type<br>☑ Certified Mail   ☐ Express Mail<br>☐ Registered   ☐ Return Receipt for Merchandise<br>☐ Insured Mail   ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)   ☐ Yes |
| 2. Article Number<br>   (*Transfer from service label*)   7001 2510 0006 2193 9202 | |

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mary Rose Ozee Nwadike, Esq.
Law Offices of Mary Rose Ozee Nwadike
8701 Georgia Avenue, Suite 600
Silver Spring, Maryland 20910

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
                                  1-10-0

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☑ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ms. Florence Olajide
7838-C Eastern Avenue, N.W.
Washington, D.C. 20012-1335

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☑ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
                                  1/5/07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☑ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FEDERAL INSURANCE COMPANY** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| **TIMOTHY OLAWUNI, et.al.** | * | **Case NO.  1:06CV00157** |
| | * | Judge Paul L. Friedman |
| Defendant | * | |
| | | |
| **TIMOTHY OLAWUNI, et. al.** | * | |
| | * | |
| Defendant/Third Party Plaintiff | * | |
| | * | |
| v. | * | |
| | * | |
| **ALEA LONDON LIMITED** | * | |
| | * | |
| Third Party Defendant | * | |
| | * | |

## CROSS-PLAINTIFFS TIMOTHY OLA WUNI, TIMOTHY ADEYEMI, FLORENCE OLAJIDE AND TIM & FLO REALTY/CONSTRUCTION FIRM LLC'S ANSWERS AND RESPONSES TO CROSS-DEFENDANT ALEA LONDON LIMITED'S FIRST SET OF REQUESTS FOR ADMISSIONS AND INTERROGATORIES

COMES NOW, the Defendants/Cross-Plaintiffs Timothy Olawuni, Timothy Adeyemi, Florence Olajide And Tim & Flo Realty/Construction, by and through counsel, MaryRose Ozee Nwadike, Esquire, and pursuant to Federal Rules of Civil Procedure, responds to the Cross-Defendant's 1st Set of Interrogatories and Request for Admission as follows.

A.      The information supplied in these Answers and Responses is not based solely on the knowledge of the executing party but includes the knowledge of the party, his agents, representatives and attorneys, unless privileged.

3.    Officers of the District of Columbia Metropolitan Police Department

INTERROGATORY NO. 3:    If a report was made by you or by an employee of yours in the ordinary cause of business with respect to the subject matter of the underlying action, identify the person who made the report, the date thereof, and the person having custody of the report.

RESPONSE Defendants/Cross-Plaintiffs object to this interrogatory on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this interrogatory on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, none.

INTERROGATORY NO. 4:    Identify all persons whom you expect to call as expert witness at trial in the underlying action, and for each such expert, state the subject mater of which the expert is expected to testify, the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion; also, attach to your answers copies of all written reports of such expert concerning those findings and opinions.

**ANSWER:**
   **Archie Wainwright**
   1324 Lynn Brook Drive
   Arlington, Virginia 22201

   Defendants/Cross-Plaintiffs reserve the right to supplement their answer to this interrogatory.

INTERROGATORY NO.5:    If you intend to rely upon any documents or other tangible things to support a position that you have taken or intend to take with respect to this action, provide a brief description, by category and location, of all such documents and other tangible things, and identify all persons having possession, custody, or control of them.

ANSWER:    Defendants/Cross-Plaintiffs object to this interrogatory on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this Request

for Information on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, Defendants/Cross-Plaintiffs respond as follows:

INTERROGATORY NO.6:     Please identify each person, other than a person intended to be called as an expert witness at trial in the underlying action, having discoverable information that tends to support a position that you have taken or intend to take in this action, and state the subject matter of the information possessed by that person.

ANSWER:

1.     Archie Wainwright
       1324 Lynn Brook Drive
       Arlington, Virginia 22201

2.     Defendants/Cross-Plaintiffs reserve the right to supplement their answers to this interrogatory.

INTERROGATORY NO.7:     To the extent that you deny that the damages to 1425 5th Street, NW, Washington D.C. were caused by the excavation and construction work conducted by Tim & Flo Realty/Construction Firm LLC on 1427 5th Street, NW, Washington D.C., state the basis in fact for your position and identify any supporting documents or reports supporting the basis for your position.

ANSWER:     Defendants/Cross-Plaintiffs object to this request for admission on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this Request for Information on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, Defendants/Cross-Plaintiffs maintain that the work they were doing at 1425 5th Street, NW, when the wall collapsed could not be described as excavation work and their acts and/or omission was not the proximate cause of the collapsed wall. Defendants/Cross-Plaintiffs maintain further that the common wall was damaged due to years of poor maintenance, including unchecked leaks.

B.      The word usage and sentence structure may be that of the attorney assisting in the preparation of the answers and thus does not necessarily purport to be the precise language of the executing party.

### General Objections

Defendants/Cross-Plaintiffs object to the production of any information or documents, which is protected by the attorney-client privilege, deliberative process privilege, work-product doctrine or any similarly recognized privilege.  Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, Defendants/Cross-Plaintiffs object to any part of the Cross-Defendant's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to produce information not in the Defendant/Cross-Plaintiffs' control or not currently known to their attorney after reasonable inquiry.

## REQUESTS FOR ADMISSIONS AND INTERROGATORIES

REQUEST FOR ADMISSION NO.1:    Admit that MaryRose Ozee Nwadike, Esq. received via certified mail on January 11, 2007, the denial of coverage letter issued by Duane K. Thompson of Baach Robinson & Lewis, PLLC dated January 4, 2007.

RESPONSE:    Defendants/Cross-Plaintiffs object to this request for admission on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this Request for Information on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, Defendants/Cross-Plaintiffs state that on or about January 7, 2007, they received a letter from Duane K. Thompson of Baach Robinson & Lewis, PLLC, dated January 4, 2007.

REQUEST FOR ADMISSION NO.2:    Admit that Timothy Oluwani was interviewed on November 7, 2006 by Gregory Kastendike, Claims Representative for Johns Eastern Company in the course of Mr. Kastendike's investigation of Tim & Flo's claim.

RESPONSE:    Defendants/Cross-Plaintiffs object to this request for admission on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this Request for Information on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, Defendants/Cross-Plaintiffs state that on or about November 7, 2006, Mr. Timothy Oluwani was interviewed by Gregory Kastendike, Claims Representative for Johns Eastern Company.

REQUEST FOR ADMISSION NO.3:    Admit that MaryRose Ozee Nwadike, Esq. was present during Timothy Oluwani's recorded statement taken by Gregory Kastendike, Claims Representative for Johns Eastern Company on November 7, 2006.

RESPONSE:    Admitted

REQUEST FOR ADMISSION NO.4:    Admit that Tim & Flo Realty/Construction Firm LLC conducted excavation work at 1427 5th Street, NW, Washington, D.C.

RESPONSE:    Defendants/Cross-Plaintiffs object to this request for admission on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this request for information on the grounds that it is incomprehensible with respect to the term "Tim & Flo Realty/Construction Firm LLC conducted excavation work at 1425 5th Street, NW, Washington, D.C." Without waiving these objections, Defendants/Cross-Plaintiffs deny that they conducted excavation work at 1427 5th Street, NW.

REQUEST FOR ADMISSION NO.5:    Admit that the damages to 1425 5th Street, NW, Washington D.C. were caused by the shear failure of soils due to excavation work below the basement wall conducted by Tim & Flo Realty/Construction Firm, LLC at 1427 5th Street, NW, Washington D.C.

RESPONSE:    Denied

REQUEST FOR ADMISSION NO.6:    Admit to the authenticity of the report entitled "Structural Investigation Report Wall Collapse 1425 5th Street, NW, Washington, D.C." prepared by Mehta Consultants, Inc.

RESPONSE:    Defendant's Cross-Plaintiffs are without enough knowledge and/or information to admit or deny the authenticity of the report entitled "Structural Investigation Report above. It is therefore denied.

INTERROGATORY NO 1.    Please identify the person answering these Interrogatories, giving your full name, residence, business address, and occupation, and office you hold with the Defendant Corporation.

ANSWER: Defendants/Cross-Plaintiffs object to this request for admission on the grounds that it is vague, overly broad, unduly burdensome, and seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants/Cross-Plaintiffs object further to this Request for Information on the grounds that it seeks information that is protected from disclosure under the attorney-client privilege and/or work product doctrine. Subject to and without waiving these objections, Defendants/Cross-Plaintiffs state that they have been assisted in the preparation of these answers by their counsel, MaryRose Ozee Nwadike, 8701 Georgia Avenue, Suite 600, Silver Spring, MD 20910 (301) 565-2424, Fax: (301) 565-2426.

INTERROGATORY NO.2:    Identify all persons having personal knowledge of the subject matter of this action, providing the names, addresses and telephone numbers of such persons and, if known, the nature of the information they may possess.

RESPONSE:

      1.     All parties herein

      2.     Archie Wainwright
                1324 Lynn Brook Drive
                Arlington, Virginia 22201

Respectfully submitted,

MaryRose Ozee Nwadike
Bar Number 455695
8701 Georgia Avenue, Suite 600
Silver Spring, MD  20910
(301) 565-2424

Counsel for Defendant

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that on this ⟋ day of _July_, 2007, a true copy of the foregoing Defendants/Cross-Plaintiffs' Response to Cross-Defendants' Interrogatories, Request for Admission and Production of Documents was served by facsimile transmission and mailing same, first class Mail, postage prepaid to:

> Duane K. Thompson
> BAACH ROBINSON & LEWIS, PLLC.
> 1201 F Street, NW, Suite 500
> Washington, D.C. 20004
> Attorney for Cross-Defendant Alea London Limited

and

> Matthew F. Noone, Esquire
> COZEN O'CONNOR
> 1900 Market Street
> Philadelphia, PA 19103
> Attorney for Plaintiff Federal Insurance Company.

MaryRose Ozee Nwadike, Esquire